[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 23, 2003
THOMAS K. KAHN
CLERK

_____

No. 01-17032

_____

D. C. Docket No. 01-00020-CR-1-MMP

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SHARON SAUNDERS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(January 23, 2003)**

Before BIRCH and BLACK, Circuit Judges, and PROPST*, District Judge.

---

* Honorable Robert B. Propst, United States District Judge for the Northern District of Alabama, sitting by designation.

BIRCH, Circuit Judge:

In this appeal, we determine the appropriate test for applying an enhancement under the United States Sentencing Guideline ("U.S.S.G.") § 2B6.1 for being "in the business of receiving and selling stolen property." We also decide whether the enhancement applies to a thief's wife who: (1) submitted fraudulent paperwork to register at least twenty vehicles stolen by her husband over a ten-year period; (2) conveyed title to, and accompanied her husband in delivering, the vehicles to buyers; (3) permitted some of the vehicles to be kept on her property; and (4) drove at least one of the stolen vehicles. The sentencing court applied the enhancement. Because we find that the defendant both received and sold stolen property with regularity and sophistication, we AFFIRM.

## I. BACKGROUND

Sharon Saunders, the wife of Terence James Saunders,[1] pled guilty to one count of possessing with intent to sell motor vehicles with altered vehicle identification numbers, in violation of 18 U.S.C. § 2321(a). She now appeals her eighteen-month sentence pursuant to 18 U.S.C. § 3742(a)(2) on the ground that the district court incorrectly applied the enhancement under U.S.S.G. § 2B6.1(b)(2) for

---

[1] Because the facts of this appeal involve a husband and wife with the same last name, we will refer to Mrs. Saunders as "Sharon" throughout this opinion.

being in the business of receiving and selling stolen property ("in the business enhancement").

Over a span of ten years, Sharon's husband stole more than seventy vehicles. Together they altered their production dates to make them ten years or older, which allowed them to be registered without any title documentation. They would then change the identification numbers of, obtain State of Georgia registrations for, and sell, the vehicles to unsuspecting third parties or keep them for personal use. Sharon's specific role was to assist in applying for and obtaining documents for the vehicles in three Georgia counties, knowing they were stolen and had altered and fraudulent identification numbers. She was driving one of the stolen vehicles, which was licensed in her name, just before her arrest and she permitted some stolen vehicles to be kept on her property. Her signature was found on the bills of sale for at least twenty-seven vehicles and she accompanied her husband in transporting some of them for delivery to their purchasers.

The probation officer recommended the enhancement. At the sentencing hearing, Sharon objected, arguing that she had been a homemaker and financially dependent on her husband. In overruling her objections, the district court determined that:

> [Sharon] was in the business; and, under [either] conspiracy theory,
> Pinkerton theory, aiding and abetting theory, co-conspirator theory,

[or] actual possession and constructive possession theory, she possessed one or more of these trailers and was in the business of selling them after they had been stolen by her husband. She was an integral part of that procedure. Without her, a direct number of these would not have gone through.

R5-9-10. The court sentenced Sharon to eighteen months of incarceration, noting that the sentence would have been at the high end of the guidelines range had the two-level enhancement not been applied.[2] Sharon timely appealed, arguing that the district court used the wrong standard for applying the enhancement and that, even had the correct standard been applied, the evidence would have been insufficient to prove that Sharon had received the vehicles or that she was in the business of fencing stolen property.[3]

_____

[2] Without the enhancement, the offense level would have been thirteen and, with a criminal history category of I, a guidelines range of twelve to eighteen months. With the enhancement, the offense level was fifteen and the range eighteen to twenty-four months. We have held that a defendant may appeal a sentence even if it falls within the guidelines ranges advocated by both parties, United States v. Fuente-Kolbenschlag, 878 F.2d 1377, 1379 & n.7 (11th Cir. 1989) (per curiam), and we must remand if such a sentence was imposed in error, see United States v. Pielago, 135 F.3d 703, 714 n.1 (11th Cir. 1998) (Kravitch, J., concurring in part and dissenting in part), unless the sentencing court "makes clear the same sentence would have been imposed irrespective of the outcome of the dispute." United States v. De La Torre, 949 F.2d 1121, 1122 (11th Cir. 1992) (per curiam). Because the court here did not explicitly state that it would have sentenced Sharon to eighteen months regardless of the outcome of the enhancement dispute, we review the merits of her appeal.

[3] In her objections to the Presentence Investigation Report ("PSR"), Sharon argued that, because she did not plead guilty to the conspiracy count dropped by the prosecution pursuant to her plea bargain, the specific offense characteristics under § 2B6.1(b)(2) could not apply to her. On appeal, she does not renew this argument and, therefore, it is not before us.

4

## II. DISCUSSION

Section 2B6.1(b)(2) of the Guidelines, applicable to convictions under 18 U.S.C. § 2321(a), provides a two-level enhancement to the base offense level, imposed for altering or removing motor vehicle identification numbers, or trafficking in motor vehicles or parts with altered or obliterated identification numbers, "[i]f the defendant was in the business of receiving and selling stolen property." U.S.S.G. § 2B6.1(b)(2) (2001).[4] The Commentary provides no clarification of the enhancement or definition for being "in the business."[5] See U.S.S.G. § 2B6.1, comment. We, also, have not particularized the appropriate test for applying the enhancement.

Initially, we must determine whether the district court used an incorrect standard, as Sharon argues, when it concluded that she was an "integral part" of her husband's illegal operation and necessary for its success. She contends that the correct standard is whether she personally participated in the scheme in a manner sufficient to trigger application of the enhancement. We agree. In United States v.

---

[4] The probation officer relied upon the Guidelines Manual that became effective on 1 November 2000. Although Sharon's sentencing hearings began in October 2001, she was not actually sentenced until 6 December 2001. Because "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced," § 1B1.11, we reference the Manual effective on 1 November 2001 throughout this opinion. The 2001 version involved no substantive changes to § 2B6.1.

[5] As we discuss, however, an amendment to an identical enhancement in § 2B1.1(b)(4)(B) affects the analysis as a clarifying amendment.

5

Maung, 267 F.3d 1113 (11th Cir. 2001), our first review of the enhancement, we said that "[t]he plain meaning of guideline § 2B6.1(b)(2) is that the defendant himself, and not just his co-conspirator, must have received and sold stolen property." Id. at 1119. Contrasting the enhancement to a neighboring provision, § 2B6.1(b)(3), which referred only to the *offense* involved, we concluded that "the (b)(2) enhancement is focused upon the defendant's own activities, in contrast to the (b)(3) enhancement's focus on the offense." Id. However, the probation officer referenced the correct standard and the court adopted the PSR in its entirety. Also, Maung was discussed in detail at the 8 November 2001 sentencing hearing and, although the court's language may have been inartful and somewhat imprecise, we nonetheless find that the sentence was based on Sharon's personal involvement in the illegal activity and that, therefore, the court did not employ an incorrect standard.

Sharon next argues that, even if the court did not use an incorrect standard, it erroneously applied the standard to the facts of her case. "When a defendant challenges the district court's application of the sentencing guidelines, we review the district court's underlying findings of fact for clear error and application of the guidelines to those facts de novo." Id. at 1118. We have never before had an opportunity to fully develop the appropriate test for applying the enhancement.

6

We do so now.[6]

> [T]he circuits have split on the proper test for determining whether a
> defendant, who was not the actual thief,[7] was "in the business" or not
> [under a similar enhancement in § 2B1.1]. Two tests have emerged.
> The "fence" test, adopted by the Fifth, Sixth, and Seventh Circuits,
> requires proof that the defendant was a person who bought and sold
> stolen property, and thereby encouraged others to commit property
> crimes. The "totality of the circumstances" test, embraced by the
> First, Third, and Ninth Circuits, and perhaps by the Second Circuit,
> employs a "case by case approach with emphasis on the 'regularity
> and sophistication of a defendant's [criminal] operation.'"

Maung, 267 F.3d at 1118 (citations omitted).

Effective 1 November 2001, the Sentencing Commission resolved the circuit

split and revised the commentary to § 2B1.1, a guideline addressing "basic forms

of property offenses." U.S.S.G. Ch.2, Pt. B.1, intro. comment. In doing so, the

Commission "clarif[ied] the meaning of 'person in the business of receiving and

selling stolen property'" and adopted the totality of the circumstances approach.[8]

---

[6] In Maung, we reversed the defendant's sentence because we found that he had not personally participated in the business of receiving and selling stolen property. 267 F.3d at 1120. We therefore did not have occasion to adopt any particular construction of the enhancement other than the personal involvement prerequisite. Id. at 1120 n.8.

[7] Courts "generally have agreed that a thief who sells goods that he himself has stolen is not 'in the business of receiving and selling stolen property.'" Maung, 267 F.3d at 1118.

[8] Section 2B1.1(b)(4) provides: "If the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property, increase by 2 levels." After the amendment, the commentary instructs courts to consider a "non-exhaustive list of factors in determining whether the defendant was in the business of receiving and selling stolen property":

(A) The regularity and sophistication of the defendant's activities.

7

U.S.S.G. App. C, Amend. 617 at 182 (2001). No such clarification exists for §

2B6.1(b)(2). Thus, as a preliminary matter, we must decide whether the

Sentencing Commission intended to extend the meaning it attributed to the

enhancement under § 2B1.1(b)(4) to that under § 2B6.1(b)(2).

"[W]here the guidelines provide no indication as to a particular application

the Court looks to the language and purpose of the Sentencing Guidelines for

instruction." United States v. Pompey, 17 F.3d 351, 354 (11th Cir. 1994).

Although definitions that appear in one section of the guidelines "are not designed

for general applicability," we may also look "on a case by case basis" to similar

words, phrases or terms used in other sections for help with interpretation.

U.S.S.G. § 1B1.1, comment. (n.2); accord United States v. Harris, 237 F.3d 585,

588-89 (6th Cir. 2001). See also United States v. Honken, 184 F.3d 961, 969 (8th

Cir. 1999) ("It should generally be presumed that the same word used in different

---

> (B) The value and size of the inventory of stolen property maintained by the defendant.
> (C) The extent to which the defendant's activities encouraged or facilitated other crimes.
> (D) The defendant's past activities involving stolen property.

U.S.S.G. § 2B1.1, comment. (n.4). Amendments to the commentary are generally binding. Stinson v. United States, 508 U.S. 36, 38, 113 S. Ct. 1913, 1915 (1993). As noted earlier, because the sentencing began on 26 October 2001 and was carried over until 6 December 2001, the 2001 Guidelines Manual applies. Even if this were not true, the amendment would be binding retroactively since, by its own ascription, it was clarifying and not substantive. See U.S.S.G. § 1B1.11(b)(2) ("[T]he court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes.").

parts of the guidelines has the same meaning."); United States v. Poff, 926 F.2d 588, 591 (7th Cir. 1991) (en banc) ("The Guidelines should be read as a whole and when the same word appears in different, though related sections, that word likely bears the same meaning in both instances.") (citation omitted).

Here, however, the clarifying words are not used the same in the two different sections. In fact, the Sentencing Commission amended § 2B1.1 with language clarifying the enhancement but did not similarly amend § 2B6.1, even though its language and structure are virtually identical and the underlying offenses conceptually similar. "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" Russello v. United States, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972) (per curiam)); accord Burton v. Tampa Hous. Auth., 271 F.3d 1274, 1279 (11th Cir. 2001). Because the interpretation of the sentencing guidelines is governed by traditional rules of statutory interpretation, see United States v. McClain, 252 F.3d 1279, 1285 (11th Cir. 2001); United States v. McMinn, 103 F.3d 216, 221 (1st Cir. 1997), we decline to draw directly from the commentary applicable to §

2B1.1(b)(4) in construing our guideline.[9]

A.    Proper Test for Applying the Enhancement

    1.  The "in the business" Test

Based on our own analysis, we now adopt the totality of the circumstances test for applying the two-level enhancement set out in § 2B6.1(b)(2) for being "in the business of receiving and selling stolen property."  Under the "fence test," "the sentencing courts merely examine[] the defendant's operation to determine:  (1) if stolen property was bought and sold, and (2) if the stolen property transactions encouraged others to commit property crimes."  United States v. Warshawsky, 20 F.3d 204, 215 (6th Cir. 1994) (holding that the purchase and resale of tens of thousands of dollars of stolen property warranted application of the enhancement because it "bestowed bountiful rewards on individuals willing to steal the property

_____

[9] We nevertheless note the striking similarities between the two sections.  Aside from language in § 2B1.1(b)(4) limiting its application to offenses involving receiving stolen property, the texts of the two enhancement provisions are identical.  In addition, § 2B1.1 "covers offenses involving altering or removing motor vehicle identification numbers, trafficking in automobiles or automobile parts with altered or obliterated identification numbers," the same offense as in § 2B6.1.  U.S.S.G. § 2B1.1, comment. (backg'd.).  Finally, for the purpose of grouping multiple counts, the guidelines require that §§ 2B1.1, 6.1 be grouped together under § 3D1.2(d).  Because of these similarities, our opinion in Maung draws freely from decisions in other circuits that address the enhancement under § 2B1.1(b)(4).  We do also, but do not find that mere reliance on the *analysis* in non-binding precedent addressing this similar enhancement requires us to *adopt* § 2B1.1's commentary for use in § 2B6.1.

of others").[10]  Courts that have adopted the "fence test" have generally done so based on the language in the commentary to former § 2B1.2 of the guidelines:

> The Sentencing Commission has decided that fences deserve longer sentences than mere thieves because a sentence based solely on "the amount of (stolen) property" recovered by the police "is likely to underrepresent the scope of their criminality and the extent to which [the defendant] encourage[s] or facilitate[s] other crimes."

Warshawsky, 20 F.3d at 214-15 (quoting U.S.S.G. § 2B1.2, comment. (backg'd.)).

By contrast, circuits adopting the totality of the circumstances test "undertake a case-by-case approach, weighing . . . [all] the circumstances, with particular emphasis on the regularity and sophistication of a defendant's operation."  United States v. St. Cyr, 977 F.2d 698, 703 (1st Cir. 1992).  In exploring the regularity of a defendant's illegal operations—the most important factor—the stolen goods need not be the defendant's sole or even dominant source of income.  Id. at 703.

---

[10]  For other cases applying the fence test, see, e.g., United States v. Myers, 198 F.3d 160, 164 (5th Cir. 1999) (holding that defendant who had received 347 stolen, blank state vehicle titles with intent to resell them was subject to the "in the business" enhancement because the conduct encouraged the theft of vehicles); United States v. Sutton, 77 F.3d 91, 94 (5th Cir. 1996) (holding that the enhancement applied where the defendant, for over five months, took orders for particular cars, had them stolen and then sold them); United States v. Mackay, 33 F.3d 489, 497 (5th Cir. 1994) (holding that the enhancement applied where the defendant "transported . . . [a single] backhoe to Dallas to sell it, advertised the sale, and arranged for the goods to be shown to interested buyers"); United States v. King, 21 F.3d 1302, 1307-08 (3d Cir. 1994) (holding that the enhancement did not apply where the defendant engaged in only two or three, unsophisticated transactions involving a single purchaser because there was no evidence that these irregular and occasional sales underrepresented his criminality).

11

Nevertheless, a sentencing court can certainly consider evidence about the amount of income generated through fencing activities, the defendant's past activities, his demonstrated interest in continuing or expanding the operation, and the value of the property handled. Where there is no indication either of a pattern of dealing in stolen property or of a developed operation that promises such consistency for the future, the defendant is unlikely to be "in the business." . . . [C]ourts have insisted that more than isolated, casual, or sporadic activity be shown before a business is found to exist.

Id. at 703-04 (citations omitted).[11] The sophistication of the defendant's operations is also important and "may itself indicate business conduct . . . [as] a meaningful proxy for regularity, say, by showing that the operation crossed a threshold of sophistication and commitment."[12] Id. at 704; see also United States v. Cottman, 142 F.3d 160, 167 (3d Cir. 1998) ("[T]he government can sustain application of the enhancement, where sales are only 'irregular or occasional,' if the sales

---

[11] Courts have generally held that evidence of fencing operations prior to that charged in the indictment is not required. See, e.g., United States v. Cottman, 142 F.3d 160, 166 (3d Cir. 1998); Sutton, 77 F.3d at 94 ("'A thief need not know the length of his fence's resume to be encouraged to commit other crimes . . . .'"); Mackay, 33 F.3d at 497; United States v. Esquivel, 919 F.2d 957, 961 (5th Cir. 1990). We agree. We also reject the argument made in United States v. Braslawsky, 913 F.2d 466, 468 (7th Cir. 1990), that considering the value of the goods in applying the enhancement is double-counting "the value of the stolen property as set forth in section 2B1.1(b)(1)'s valuation table." The regularity requirement of the totality of the circumstances test is merely a surrogate for the "business" component of the enhancement. To the extent that this component itself constitutes double counting, we defer to the Sentencing Commission's judgment.

[12] The Second Circuit has held that taking sophistication into account in applying the enhancement also does not constitute impermissible "double counting" of the base offense level. See United States v. Salemi, 46 F.3d 207, 210-11 (2d Cir. 1995). Also, the Third Circuit has held that the enhancement does not require proof that the defendant "was the leader, organizer, or driving force behind the operation." See Cottman, 142 F.3d at 166. We agree with both holdings.

underrepresent the true 'scope of the defendant's criminality.'").[13]

We adopt the totality of the circumstances test for several reasons. First, determining the regularity and sophistication of a defendant's fencing operation, though inherently subjective, is far less so than deciphering to what extent the operation encourages subsidiary, future crimes. For the same reason, it is also more lenient on defendants. Moreover, the policy rationale on which courts such as Warshawsky relied in developing the fence test has subsequently been withdrawn from the guidelines commentary in 1993 when §§ 2B1.1 and 1.2 were consolidated. Concluding that there was never a bright line for applying the enhancement, the First Circuit in St. Cyr noted:

> [The commentary] proves too much. . . .[E]ven purchasers of stolen goods who never sell and sellers of stolen goods who never purchase can strengthen the black market and thereby facilitate other crime. . . . It is almost always possible to argue that the conduct for which a defendant has been convicted is likely to underrepresent his entire

---

[13] For cases applying the totality of the circumstances test, see, e.g., United States v. Coviello, 225 F.3d 54, 65 (1st Cir. 2000) (holding that the enhancement applied where the regularity of the illegal conduct "was easily satisfied"); Cottman, 142 F.3d at 167 (holding that the enhancement applied where there was "abundant evidence that the operation . . . was run with a large measure of professionalism"); United States v. Zuniga, 66 F.3d 225, 229 (9th Cir. 1995) (holding that the enhancement applied where the defendant "had no legitimate means of livelihood . . . [;] was involved with stolen property beyond the stolen property in this case; . . . had knowledge of stolen property in other situations; and . . . had previous numerous convictions for stolen property offenses"); Salemi, 46 F.3d at 209-10 (holding that the enhancement applied where the defendant had a past conviction for fencing, charge for criminal possession of stolen property and police reports of his suspected fencing activity and where the defendant had "received over two and one-half tons of silver, valued at $320,000 . . . [with] demonstrated expertise at processing the silver bars into lighter units, packaging them and sending them to refineries").

13

criminal career or his contribution to a general subculture of criminality. There is no sound basis on which trafficking in stolen goods, *per se*, can be singled out in this respect.

977 F.2d at 702.[14]

2. The Fence Requirement

Because Sharon also attacks the district court's application of the enhancement on the ground that she was not a fence, we address whether the totality of the circumstances test operates to the exclusion of the first prong of the fence test: whether stolen property was actually bought and sold. In short, can the enhancement be applied where the defendant was either a seller who did not receive or a receiver who did not sell? We hold that it cannot; a prerequisite to the application of the two-level enhancement in § 2B6.1(b)(2) is that the defendant personally received *and* sold stolen property.

In considering this question, we look first to the plain language and ordinary meaning of the enhancement. See United States v. Singh, 291 F.3d 756, 761 (11th Cir. 2002). By stating "receiving and selling" in the conjunctive, the Sentencing Commission indicated its intent that the defendant must have engaged in both. See U.S.S.G. § 2B6.1(b)(2). Indeed, "[t]he common understanding of a person in the

---

[14] As noted below, while the *language* of the commentary has been withdrawn, we find that the underlying *purpose* of the enhancement—to punish fences more severely—survives.

14

business of receiving and selling stolen property is a professional fence . . . ."
United States v. Braslawsky, 913 F.2d 466, 468 (7th Cir. 1990). In addition, the text of the amendment to the enhancement in § 2B1.1(b)(4) justifies the totality of the circumstances test because it "more properly targets the conduct of the individual who is actually in the business of *fencing*." U.S.S.G. App. C, Amend. 617 at 182 (2001) (emphasis added). By its plain terms and meaning, then, the enhancement first and foremost requires that the defendant at least be a fence for stolen property.

The structure of the guidelines and "parallel development of the [other] sentencing guideline governing thefts of property" are also instructive. McMinn, 103 F.3d at 219. In 1989, the words "receiving and" were added to the language of the enhancement in former § 2B1.2 increasing the penalty for those "in the business of selling stolen property," U.S.S.G. § 2B1.2(b)(3)(A) (1989), in order to "retain its narrow focus upon defendants who 'fence' stolen goods." McMinn, 103 F.3d at 220. Also, prior to its consolidation with § 2B1.1 in 1993, § 2B1.2, dealing with offenses involving the receipt of stolen property, included this enhancement while § 2B1.1, dealing only with theft offenses, did not. After consolidation, the enhancement in § 2B1.1 now applies only "[i]f the offense [itself first] involved receiving stolen property," U.S.S.G. § 2B1.1(b)(4) (2001) (emphasis added), and,

15

therefore, does not apply to theft crimes. See McMinn, 103 F.3d at 220-21.

Coupled with the fact that other enhancements in the guidelines apply equally to thieves and fences, the Commission must have intended that only fences, who by definition are not thieves themselves, receive the enhancement. See id. at 219-20.

We also look to the underlying purpose of the enhancement. See Singh, 291 F.3d at 761 (where there is no particular application indicated by the guidelines, we look both to their language and purpose). When we study its rationale, the enhancement evinces a clear intent to impose heightened punishment on fences. United States v. Sutton, 77 F.3d 91, 94 (5th Cir. 1996) (The enhancement is intended as a "punishment for fences, people who buy and sell stolen goods . . . as opposed to thieves who merely sell the goods which they have stolen."). Commentary to former § 2B1.2(b)(4)(A), later consolidated with § 2B1.1, reveals this intent: "Persons who receive stolen property for resale receive a sentence enhancement because the amount of property is likely to underrepresent the scope of their criminality and the extent to which they encourage or facilitate other crimes."[15] U.S.S.G. § 2B1.2, comment. (backg'd.) (1992). After all, "a

---

[15] Although this language no longer appeared after the consolidation of §§ 2B1.1 and 2B1.2 in 1993, there is no reason to suppose that the omission was motivated by a desire to abolish or modify the underlying legislative purpose. But see United States v. Richardson, 14 F.3d 666, 674 (1st Cir. 1994) ("Fortunately, and perhaps presciently, we did not rest our decision [in St. Cyr] on the commentary."). There is a distinction, however, between relying on the language of the commentary to justify that any defendant subject to the enhancement at least be a fence, as

16

professional fence facilitates the commission of many thefts by creating a clearinghouse for stolen goods." Braslawsky, 913 F.2d at 468. That the enhancement requires, at a minimum, that the defendant be a fence "comports with basic guideline[s] sentencing policy as well." McMinn, 103 F.3d at 221. Specifically, Congress requires that "court[s], in determining the particular sentence to be imposed, . . . consider . . . the need for the sentence . . . to reflect the seriousness of the offense . . . [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A)-(B).

> [In this regard t]he services of a professional fence undoubtedly facilitate the ready, advantageous disposition of property stolen by the less well-situated thief . . . . Furthermore, the interposition of a sophisticated fencing operation between the thief and the ultimate purchaser of the stolen property may confound or obstruct the investigation and prosecution of theft offenses . . . [as] the loot is more likely to be dispersed before law enforcement agencies can respond.

McMinn, 103 F.3d at 221.

Moreover, we said in Maung that "[a] defendant who has not received and

---

required by the text of the enhancement, and using it to develop an open-ended test for applying the enhancement. Furthermore, if the underlying purpose of the enhancement—to more severely punish fences—were deemed abolished, there would be no apparent reason for the enhancement and its application would merely duplicate the punishment for the base offense itself, both for a thief who sells the pilfered items or a receiver who does not sell the items acquired. After all, "[i]f every thief who sold his stolen property was in the business of receiving and selling stolen property, then . . . [the enhancement] would be a circuitous method . . . to punish the transportation, receipt, or sale of stolen property. Instead of relying on . . . [the] enhancement, the Sentencing Commission could have simply raised the base offense level by four points." Braslawsky, 913 F.2d at 468.

17

sold cannot be 'in the business of receiving and selling.'" 267 F.3d at 1119. Other circuits, too, have held that the enhancement applies only when the defendant is first a fence. See, e.g., McMinn, 103 F.3d at 219; Braslawsky, 913 F.2d at 468.

Finally, we note that an interpretation of the enhancement requiring that the defendant be a fence is not inconsistent with our adoption of the totality of the circumstances test for applying the enhancement. The fence test has two prongs.[16] The first requires the receipt and sale of stolen goods as a threshold requirement, the second, the facilitation of theft and other crimes. It is the second prong that distinguishes the fence test from the totality of the circumstances test because it sets out the touchstone for determining whether the defendant was actually "in the business." That the defendant must also receive and sell stolen goods is the common denominator between the two tests. The decisions of the First Circuit most clearly illustrate this proposition. In St. Cyr, the court rejected the fence test and adopted the totality of the circumstances test. 977 F.2d at 703. Later in McMinn, however, the court held that the enhancement does not apply to mere thieves who are not also fences, 103 F.3d at 219, and rejected the government's argument that the "enhancement guideline should be construed simply to require proof that McMinn's sales of stolen goods [, which he himself had stolen,] had a

---

[16] See infra p. 10.

18

certain regularity or sophistication" under the totality of the circumstances test. Id. at 222. In doing so, the court pointed out that its "opinion in St. Cyr [adopting the totality of the circumstances test] . . . neither expressed nor implied disapproval of the basic proposition that the . . . enhancement guideline should apply only to 'professional fences.'" Id.

Other courts agree. "Although some Circuits have described the 'totality of the circumstances' approach, upon which this Court relies, as a 'competing test,' . . . [we are not] foreclose[d] . . . from requiring in the future that a defendant be a 'fence' for the enhancement to apply." Cottman, 142 F.3d at 167 n.9. Some courts have declined even to adopt one or the other test because the facts of their cases trigger the enhancement under both tests. See, e.g., United States v. Payseno, 104 F.3d 191, 192 (8th Cir. 1997) (Because "[t]he court's factual findings indicate that Payseno received and sold stolen goods for profit over an extended period of time . . . [and] she specifically purchased products . . . which she knew were stolen . . . , it is not necessary to employ either of the two competing tests . . . ."). In fact, "we have discovered hardly a [single case] . . . , in which a federal appellate court upheld the "in the business" enhancement against a defendant who did not personally participate in receiving and selling (or intending to sell) stolen

19

property," including those courts in the totality-of-the-circumstances-circuits.[17]

Maung, 267 F.3d at 1119-20.   Thus, we conclude that, even under the totality of the circumstances test, the enhancement in guidelines § 2B6.1(b)(4) only applies if the defendant fenced stolen property.

B.  Application of the Enhancement

Here, the district court's factual findings were not clearly erroneous and justified application of the two-level enhancement.[18]  We first examine the facts

---

[17]  See, e.g., Coviello, 225 F.3d at 65 (defendant admitted fencing operation); Cottman, 142 F.3d at 167 ("The preponderance of the evidence here clearly establishes that Cottman filled a 'fencing' role . . . ."); Zuniga, 66 F.3d at 229 ("The district court could reasonably conclude . . . that Zuniga was . . . fencing property [] in addition to property stolen by him."); Salemi, 46 F.3d at 210 ("[I]f anyone deserves the title of 'fence,' it is Salemi.").  The one exception is United States v. Collins, 104 F.3d 143, 144 (8th Cir. 1997), in which the court held that a defendant who stole goods on behalf of an auction house that subsequently sold them was subject to the enhancement, where the defendant's conduct in splitting the proceeds with the auction house made him an integral part of the professional fencing operation.  The court did not suggest that, to receive the enhancement, the defendant need not be a fence, only that the defendant in this case was subsumed within the fencing organization itself even though he personally stole the objects.

[18]  In her reply brief, Sharon obliquely makes the argument that the district court failed to make explicit findings of fact and conclusions of law.  Reply Br. at 6 n.3.  Yet, we have observed that "[w]hen the court mandates no departure [from the applicable guidelines range], the sentencing judge need not offer further reasons justifying the sentence."  United States v. West, 898 F.2d 1493, 1503 (11th Cir. 1990).  Even if the court does so depart, it "has wide discretion in departing vertically on the sentencing guidelines chart. . . . [U]nlike horizontal departures, vertical departures do not require the district court to make explicit explanations for the departures it makes."  United States v. Hersh, 297 F.3d 1233, 1251 (11th Cir. 2002).  Thus, "[s]o long as the district court's decision is supported by the record and the court clearly resolves any *disputed* factual issues, a simple statement of the district court's conclusion is sufficient."  United States v. Rodriguez De Varon, 175 F.3d 930, 939 (11th Cir. 1999) (en banc) (emphasis in original).  Here, the court did not depart from the guidelines range and clearly resolved all disputed factual issues in favor of the PSR.  While 18 U.S.C. § 3553(c) requires a court to "state in open court the reasons for its imposition of the particular sentence," the court here did just that

20

supporting the conclusion that Sharon both received and sold stolen cars and then proceed to the totality of the circumstances inquiry as to the regularity and sophistication of the operation, keeping in mind that "[t]he Government bears the burden of establishing by a preponderance of the evidence the facts necessary to support a sentencing enhancement." United States v. Askew, 193 F.3d 1181, 1183 (11th Cir. 1999).

We first determine whether Sharon sold the stolen vehicles. In Maung, we refused to enhance the defendant's sentence under § 2B6.1(b)(2) because he was not personally involved in selling the stolen vehicles. 267 F.3d at 1120. Specifically, we said that Maung was merely a middleman "processing phony paperwork and making arrangements to illegally export the cars to Eastern Europe" and that, even if he were in constructive possession of the cars, he did not sell them because there was "no evidence that . . . [he] had any contact with the purchasers or shared in the proceeds from the sale."[19] Id. at 1120. The government argues, however, that, unlike Maung, Sharon sold the stolen vehicles because she enjoyed and survived off of the profits from the illegal activity, there being no evidence of

_____

both when it found Sharon to be "in the business," R5-9, and when it "determine[d] that the Presentence Report is complete, true, and accurate." Id. at 13.

[19] We did not mean to suggest that these are the only two factors that could implicate a defendant in selling stolen property.

21

any other legitimate income during the period in question. On the other hand, Sharon argues that she could not possibly be in the business of receiving and selling stolen goods because she was a homemaker and financially dependent on her husband and that she was merely a paperwork middleman like Maung.[20]

A defendant is not entitled to immunity from the enhancement only by virtue of his or her status as a homemaker. However, spousal financial dependence, alone, is also insufficient to conclude that the defendant enjoyed the proceeds of an illegal operation conducted by his or her spouse and therefore was "in the business." It does not rise to the level of the type of partnership envisioned in United States v. Collins, 104 F.3d 143 (8th Cir. 1997). There, the court held that "[s]ince he split the proceeds of sales at Truman's Auction house after the sales occurred, Collins was part of a business which received and sold stolen goods." Id. at 144. Had that been Sharon's only conduct, we would have agreed with her that the enhancement should not apply.

---

[20] She also argued at sentencing that the court should consider a downward departure both because she committed the acts under the duress of physical threats from her husband, see U.S.S.G. § 5K2.12 (2001), and because her conduct constituted aberrant behavior. See U.S.S.G. § 5K2.20. Even though the court took these arguments into account in determining the sentence within the applicable guidelines range, it declined to grant Sharon the downward departures she requested and this is not before us on appeal. Although Sharon's counsel makes a plausible argument that there could be no real partnership where Sharon succumbed to the physical intimidation of her husband, the enhancement makes no accommodation for duress and coercion other than the downward departure in § 5K2.12.

Sharon's conduct, however, went beyond mere paperwork or dependence on the illegal proceeds. First, her signature appears on the bills of sale for twenty-seven of the vehicles. At sentencing, defense counsel conceded that Sharon "had to sign [the vehicles] out and sign them over to the Florida Pine Straw people, and then they would issue the check thereto." R5-8. While, "receiving goods and having them loaded into containers, as well as completing the necessary exportation paperwork" may not be selling stolen property, Maung, 267 F.3d at 1114, 1120, actually conveying title to such property is. Second, Sharon participated in transporting and delivering the vehicles to purchasers. Although she may not have traveled in the same vehicle when accompanying her husband or made the physical deliveries herself, we find no basis for concluding that a person sells stolen property only when personal contact is made with the buyer or buyers.[21] Third, at her plea colloquy, Sharon admitted that the facts recited by the prosecution were true and correct, including the fact that "[o]nce the registrations were obtained in her name, Sharon Saunders would sell and transfer the vehicles to

---

[21] As to Sharon's argument that the government did not prove that she knowingly transported the vehicles, her counsel's admission at sentencing as to her state of mind speaks for itself: "[A]t first there was no suspicion, then there was some suspicion, and then there was willful blindness, knowing that he[r husband] couldn't be coming up with that many good deals, and then to the point of where he had Ms. Saunders actually get some vehicles or trailers titled in her name." R4-6.

23

innocent third parties."[22]  R2-13-14.  Thus, the record, including these concessions, fully supports the district court's finding that Sharon was in the business, at least as to selling the vehicles.

We also find that Sharon received stolen vehicles.  On appeal, she argues that, because her husband personally stole the vehicles, he was not a fence and, therefore, neither was she, since her "criminal liability flows from the assistance she provided her husband."[23]  Reply Br. at 8.  It is true that the act of receiving stolen goods is commonly understood as distinct from the initial theft.  "Under the common-law tradition, stealing property from another normally does not equate with 'receiving' property from its rightful owner."  McMinn, 103 F.3d at 219; see also United States v. Koran, 453 F.2d 144, 146 (10th Cir. 1972) ("[T]he offense of possession of stolen goods is distinct from the offense of receiving" them.); United States v. Heflin, 223 F.2d 371, 376 (5th Cir. 1955) ("[R]eceiving stolen money and conspiracy are offenses separate from bank robbery . . . .").

---

[22]  Sharon contends, however, that any concession made during the plea colloquy was "undercut by the fact that neither the Government nor the district court relied upon it at the sentencing." Reply Br. at 7.  Sharon cites no authority for this proposition, nor are we able to find any. Moreover, we have said that "[t]he findings of fact of the sentencing court may be based on evidence heard during trial, facts admitted by a defendant's plea of guilty, undisputed statements in the presentence report, or evidence presented at the sentencing hearing."  United States v. Wilson, 884 F.2d 1355, 1356 (11th Cir. 1989).

[23]  It is unnecessary to apply a "plain error" analysis to this argument because we will assume that, in objecting to the enhancement itself, defense counsel properly objected at sentencing to the implicit finding that Sharon was also a fence.

The evidence demonstrates, however, that Sharon did receive stolen vehicles. We have said "that the Congress did not intend a limited, technical definition of the word 'receive.' We believe that accepting a good and having either physical control of or apparent legal power over a good is sufficient to show that an individual received it." United States v. Strauss, 678 F.2d 886, 893-94 (11th Cir. 1982); see also United States v. Walker, 384 F. Supp. 262, 263 (E.D. Tenn. 1973) ("To 'receive' stolen property . . . means acquisition of control in the sense of physical dominion or apparent legal power to dispose of property; it envisages possession or control as an essential element.") (citation omitted); 76 C.J.S. Receiving Stolen Goods § 6 (2002) ("The definition of receiving may include . . . control over the property."). Other circuits have found that possession of stolen property may be circumstantial evidence of prior receipt. See, e.g., United States v. Tutiven, 40 F.3d 1, 8 (1st Cir. 1994); United States v. Johnson, 709 F.2d 515, 517 (8th Cir. 1983) (per curiam); United States v. Brown, 472 F.2d 1181, 1182 (6th Cir. 1973).

Here, it is undisputed that some of the stolen vehicles were titled in Sharon's name and that she fraudulently registered at least twenty of the stolen vehicles in Georgia and kept some of the vehicles on her property. Thus, she had apparent legal control over them. That she possessed the vehicles in this manner and did not

herself steal them also gives rise to circumstantial evidence of prior receipt.

Moreover, case law has generally held that "it is immaterial from whom . . . [stolen

goods] are received . . . [and] it makes no difference whether [the] accused, in

receiving the goods, acted for himself or merely as [an] agent for another." 76

C.J.S. Receiving Stolen Goods § 6. The fact that Sharon obtained control over the

vehicles, and accepted the vehicles, from her own husband-thief is therefore

inconsequential.[24]

---

[24] Thus, a person who acts as the agent of a thief when selling stolen property can be guilty of "receiving" that property from the thief where the other elements of the offense are met. Although there appears to be no federal cases addressing this precise issue, we have said that it is "[in]significant how [an] accused [charged with transporting stolen goods] acquired possession of the[m]." Johnson v. United States, 207 F.2d 314, 319 (5th Cir. 1953). Also, the Supreme Court has held that an indictment under the then-existing 18 U.S.C. § 101 prohibiting receiving stolen property belonging to the federal government need not allege from whom the property was received. Kirby v. United States, 174 U.S. 47, 63-64, 19 S. Ct. 574, 580 (1899). "If the stamps were in fact stolen from the United States, and if they were received by the accused, no matter from whom, with the intent to convert them to his own use or gain, and knowing that they had been stolen from the United States, he could be found guilty of the crime charged, even if it were not shown by the evidence from whom he received the stamps." Id. at 63-64, 19 S. Ct. at 580 (emphasis added); see also Johnston v. United States, 22 F.2d 1, 2 (9th Cir. 1927). The Court reasoned that, unlike statutes "ma[king] the receiver of stolen goods strictly an accessory" to the principal theft crime, the federal statute created "a distinct, substantive felony, for which [the defendant] can be tried either before or after the conviction of the principal felon, or whether the latter is tried or not." 174 U.S. at 62, 19 S. Ct. at 580. Because 18 U.S.C. § 2321 defines receiving and possessing stolen property in the disjunctive, Congress must have intended that receiving stolen goods under this provision likewise be a substantive offense distinct and independent from the theft offense. See also United States v. Koran, 453 F.2d 144, 146 (10th Cir. 1972) (concluding that "the offense of possession of stolen goods is distinct from the offense of receiving" them under 18 U.S.C. § 659 because the statute defines the offenses in the disjunctive). Thus, as in Kirby, an indictment for receiving under 18 U.S.C. § 2321 need not allege from whom the defendant received the goods. If that information is immaterial to the indictment, it is not a substantive element, or a limiting feature, of a "receiving" offense and, therefore, not a consideration in applying the sentencing enhancement involved in this case. Finally, in Collins, the Eighth Circuit held that the sentencing

Having concluded that Sharon received and sold stolen vehicles and therefore acted as a fence, we now inquire whether, under the totality of the circumstances, Sharon was "in the business of receiving and selling stolen vehicles." We pay particular attention to the regularity and sophistication of the illegal operations. Because Sharon conceded at the plea colloquy that her knowingly illegal activities spanned at least four and one-half years and admitted a total loss to her victims of $259,203.56, we do not hesitate in concluding that her fencing activities were regular, frequent and voluminous. Additionally, the facts that (1) the vehicles's paperwork was altered to indicate that they were more than ten years old, (2) the vehicles were registered in Georgia so that it would be unnecessary to obtain a title for them, and (3) the defendants involved at least one other co-conspirator in their activities, indicate the necessary degree of sophistication. Accordingly, the district court did not err in enhancing Sharon's sentence under § 2B6.1(b)(2).

### III. CONCLUSION

We have determined that in applying the two-level enhancement under §

---

enhancement at issue here applied to a defendant who acted as a fence by *selling* stolen property, where he was the thief but, because he split the proceeds with the auction house that re-sold the property, was also part of an enterprise engaged in fencing stolen property. 104 F.3d at 144. If a defendant can "sell" stolen property where he first transfers it to a fence and then acts with the fence in re-selling the property, a defendant can also "receive" stolen property where she, as here, first takes control of it from a thief and then acts with the thief in re-selling the property.

2B6.1(b)(2) for being "in the business of receiving and selling stolen property," the defendant must have, at a minimum, acted as a fence. Beyond that, the sentencing court must examine the totality of the circumstances with a particular emphasis on the regularity and sophistication of the illegal activity to determine whether the defendant's conduct amounted to a fencing business. This inquiry may include other factors such as the value of the stolen property, the defendant's past activities involving stolen property and the extent to which the illegal operations encouraged or facilitated other criminal activity. As we have explained, the defendant here obtained title and registration for, and signed the bills of sale transferring ownership of, some of the stolen vehicles. Furthermore, her illegal conduct spanned almost five years and caused hundreds of thousands of dollars of loss to her victims. Because the enhancement was correctly applied by the district court, we **AFFIRM.**